# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, | Civil No. 13-524 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| BRADLEY GIBBS, | |
| Defendant. | |

Katherine A. McBride, **MEAGHER & GEER, PLLP**, 33 South Sixth Street, Suite 4400, Minneapolis, MN 55402, for plaintiff.

Nicholas J. Maxwell **MASCHKA, RIEDY, & RIES**, Post Office Box 7, Mankato, MN 56002, for defendant.

This case involves a dispute over whether an automobile insurance policy covered the policyholder's eighteen-year-old son who had recently moved out of the policyholder's house. Defendant Bradley Gibbs was seriously injured when he was a passenger in a car crash and sought underinsured benefits from his mother's insurance policy through plaintiff State Farm Mutual Automobile Insurance Company ("State Farm"). State Farm declined coverage, asserting that Gibbs was not covered by the policy because he was not a "resident relative" of his mother's at the time of the accident. State Farm brought this action seeking declaratory judgment of non-coverage and both parties move for summary judgment. The Court concludes that a genuine dispute of

material fact exists as to whether Gibbs could be considered a "resident relative" within the meaning of the policy, and will deny both motions for summary judgment.

## BACKGROUND

### I.    THE ACCIDENT

Gibbs was badly injured in a car accident on December 16, 2011.  (Aff. of Katherine A. McBride, Ex. 1 at 1-8, June 13, 2013, Docket No. 16.)[1]  Gibbs was 18 years old at the time of the accident.  (*Id.*, Ex. 1 at 2.)  Gibbs was riding in a car with three friends, including the driver, Kelsie Seykora.  (*Id.*, Ex. 1 at 1-8.)  Seykora's father owned the vehicle involved in the crash and was insured through Progressive Insurance Company ("Progressive").  (*Id.* at 2.)

### II.    GIBBS' LIVING SITUATION

Up until a few months before the accident, in September 2011, Gibbs lived with his mother, Rita Gibbs ("his mother" or "Mrs. Gibbs") in a house on Swift Street in St. Peter, Minnesota.  (McBride Aff., Ex. 4 (Dep. of Bradley Gibbs ("Gibbs Dep.") at 15).)  In September 2011, Gibbs moved from his mother's home in St. Peter to an apartment, a fifteen minute drive away in North Mankato, Minnesota with two high school friends.  (*Id.* at 25.)  Gibbs testified in his deposition that he moved because his friend had "just c[o]me back from his infantry training in the Army and he was saying

---

[1]    All citations to the record use the pagination of the exhibit itself, rather than the ECF pagination.  For example, the page numbers for the first exhibit to the McBride Affidavit refer to the page numbers found in the bottom right-hand corner, and references to depositions use the pagination of the deposition transcript.

right before that when he left that he wanted to get an apartment with me and he already set up arrangements to get an apartment with [the third friend]." (*Id.*) His two friends signed a six-month lease but Gibbs was not on the lease; Gibbs testified that he did not want to be on the lease because he did not want to be responsible for paying. (*Id.* at 27.) It was a two-bedroom apartment and Gibbs slept on the floor near the living room. (*Id.* at 42-43.)

When he moved in, he moved some of his belongings from his mother's house: clothes, his video game system, his car, his phone, and a few small pieces of furniture such as foot rests and folding chairs. (*Id.* at 40-41.) Gibbs testified that he "left a lot of the stuff in my room, stuff like medals and a bunch of childhood-like awards and stuff" and his couch, bed, and his two pet cats. (*Id.* at 44.) In November, when one of his friends was unable to pay rent, Gibbs moved into that friend's bedroom and the friend took Gibbs' place on the floor. (*Id.* at 42-43.) At that point Gibbs moved an extra bed from his mother's home to the apartment to sleep in. (*Id.*)

When Gibbs moved in September 2011 he had a part-time job working for a Halloween costume company. (*Id.* at 27-28.) He made $9.50 an hour and worked about 25 hours a week. (*Id.* at 29.) He testified that when he took the job he knew that it would be temporary – that it would end at the end of October or beginning of November; it ended October 31. (*Id* at 29.) When that job ended, he began going to a temporary staffing agency. (*Id.* at 30.) According to Gibbs' deposition testimony, at this point "I was really close to moving back [to his mother's] but I found a savings bond so then I could pay rent to live [at the apartment] another month." (*Id.* at 31.) But he thought he

would be moving back to his mother's house "[b]y the end of December, if not the beginning of December." (*Id.*) He testified that he believes he gave the temporary agency his mother's address in St. Peter because he anticipated moving back in with her. (*Id.* at 30.) He and his mother had a few conversations near the end of November about him moving back in if he needed to: "It was when I was cashing out that savings bond. I was talking to her about potentially moving back. . . . She said if I had to move back, it wouldn't be a problem with her. . . . I might have had another conversation too after that date." (*Id.* at 48-49; *see also* McBride Aff., Ex. 8 (Dep. of Rita Gibbs ("Rita Gibbs Dep.") at 24-25 ("I had asked him how he thought he was going to pay his rent another month and he didn't really have an answer yet at that point. So it was mentioned but nothing was planned."))).) He testified at his deposition that at this point he made some efforts to begin moving his belongings back to his mother's house: "I brought some of my stuff back to my mom's place" including clothing, and a "couple video game systems." (Gibbs Dep. at 31.)

While he lived in the apartment he continued to receive mail at his mother's house, kept keys to his mother's house, and believes that he remained on her health insurance. (*Id*. at 35-36; *see also* Rita Gibbs Dep. at 23.) He visited his mother approximately once a week – she would pick him up in North Mankato and take him to the house in St. Peter where they would eat, she would do his laundry, and he often stayed overnight. (Rita Gibbs Dep. at 22.)

III.   **MRS. GIBBS' STATE FARM POLICY**

Mrs. Gibbs held an automobile insurance policy ("the Policy") with State Farm, which she secured in November 2011 after cancelling her prior automobile insurance policy with MetLife.  (Rita Gibbs Dep. at 15.)  Mrs. Gibbs testified that she switched from MetLife to State Farm when MetLife refused to take Gibbs off her policy as a driver after his own car stopped functioning.  (*Id.*)[2]  After Gibbs' car stopped working, Mrs. Gibbs tried to take the car and Gibbs off the MetLife insurance policy and to keep only herself and her Honda Accord on the policy:

> I requested Met Life to take the car and Brad off my policy since he no longer lived at home and his car was not functioning at that time.  Instead, they took the Thunderbird off my policy and they added him as a driver to my Honda Accord.  I asked them if they could remove him from my policy since he lived in a different town and wasn't driving my car and they said they could not so I took a new policy with State Farm for my Honda Accord.

(*Id.*)  Mrs. Gibbs testified that she indicated in her application to State Farm that she was the only person living in her household at the time she took out the State Farm Policy.  (*Id.* at 17; *see also* Supplemental Aff. of Katherine McBride, Ex. 10, July 17, 2013, Docket No. 34 (Rita Gibbs is only name listed on her State Farm application).)  Gibbs testified that he did not know if he was listed as a driver on this policy or not.  (Gibbs Dep. at 59.)

---

[2] Gibbs' owned a 1994 Ford Thunderbird that he bought in the summer of 2011.  (Gibbs Dep. at 32.)  It was insured through his mother's policy with MetLife and his mother paid for the insurance until the brakes went out in October or November.  (*Id.* at 33-34.)  At that point, he left it parked on the lawn at his apartment in North Mankato.  (*Id.* at 34.)  Without the car, he got to work by getting rides from his friends and his mother.  (*Id.* at 52.)

After Gibbs' accident, he sought coverage under the "Underinsured Motor Vehicle Coverage" of the Policy.  The Policy provides: "*We* will pay compensatory damages for *bodily injury* an *insured* is legally entitled to recover from the owner or driver of an *underinsured motor vehicle*."  (Second Aff. of Nicholas Maxwell, Ex. 1 ("State Farm Policy") at 25, July 11, 2013, Docket No. 30 (emphasis in original).)  The Policy defines "insured," in relevant part, as "1. *you*; 2. *resident relatives*; [and] 3. any other *person* while *occupying* [your car, a newly acquired car, or a temporary substitute car]."  (*Id.* at 24 (emphasis in original).)  The term "you" in the Policy refers to Rita Gibbs, the named insured on the Policy.  (*Id.* at 6.)  The Policy defines "resident relative" as follows:

> *Resident Relative* means a *person*, other than you who is:
> 1. related to *you* by blood, marriage or adoption who resides with *you*; or
> 2. a minor:
>    a. in the custody of *you* or a *person* defined in item 1 above; and
>    b. who resides with you.
>
> A *person* resides in the same household with *you* if that *person's* home is usually in the same family unit, even though temporarily living elsewhere.

(*Id.* at 5 (emphasis in original).)  State Farm denied coverage for Gibbs after determining that Gibbs was not an insured under the Policy because he was not a resident relative within the meaning of the Policy at the time of the accident.  (Aff. of Nicholas Maxwell, Ex. D, July 3, 2013, Docket No. 26.)

## IV.   THE PROGRESSIVE AFFIDAVIT

Part of the parties' dispute involves an affidavit Gibbs submitted to the Seykoras' insurance company, Progressive.  At some point after the accident, Progressive contacted Gibbs and Mrs. Gibbs to discuss the availability of coverage for Gibbs' medical expenses

under the Seykoras' insurance policy.  It is not completely clear from the record how this came about, but Mrs. Gibbs testified in her deposition that Progressive called her on the phone and "they were not really threatening but kind of intimidating saying that this form had to be filled out or they wouldn't release the first $20,000 to start to pay medical bills."  (Rita Gibbs Dep. at 28.)  The form in question was an affidavit of no insurance/residency, which Gibbs ultimately submitted to Progressive.  (*See* McBride Aff., Ex. 3.)  The form, which was notarized, listed the following:

> I, <u>BRADLEY GIBBS</u>, of full age, being duly sworn according to law, upon my oath depose and say that:
>
> 1. On or about <u>DECEMBER 16, 2011</u> (Date of Accident), I lived at:
>    *630 Lyndale St.*
>    *Apt. 2*
>    *North Mankato*
>    *MN*
>    *56003*
> . . .
>
> 3. Neither I or any relative living in my household was the owner of motor vehicle or have automobile insurance.
>
> 3a. I own a motor vehicle but do not have automobile insurance due to the following reason(s): *car does not run*
>
> 4. To the best of my knowledge, I am not otherwise entitled to Minnesota No-Fault benefits from this accident.
> . . .
>
> 7. List all relatives living in your household.  If no one lives with you, indicate "NONE."  *None.*
> . . .
>
> SWORN AND SUBSCRIBED TO BEFORE ME THIS
> *6*th Day of *January*, Year *2012*

(*Id.* (handwritten responses in italics).)  Gibbs testified at his deposition with regard to the form that "I personally did not really know any of this.  I was at the time laying in the

hospital bed all strung up on painkillers.  I didn't really know what was going on at that time."  (Gibbs Dep. at 60; *see also id.* at 36 ("I don't remember how all that worked because I was under a lot of drugs at the time.").)  With regard to the form listing his address as the North Mankato apartment, he said "I don't know why that is listed like that."  (*Id.* at 63.)  Gibbs' medical records indicate that he was prescribed oxycodone-acetaminophen on December 23, 2011 and that he was still taking them when he went for a follow-up visit on January 20, 2012.  (Second Maxwell Aff., Ex. A at 3.)

## V.     THIS PROCEEDING

State Farm brought this action seeking declaratory judgment that Gibbs is not a "resident relative" under the Policy.  (Compl., Mar. 6, 2013, Docket No. 1.).  Both State Farm and Gibbs move for summary judgment.  (Pl.'s Mot. for Summ. J, June 13, 2013, Docket No. 13; Def.'s Mot. for Summ. J., June 21, 2013, Docket No. 22.)  Because the Court concludes that a reasonable jury could conclude either that Gibbs is covered by Mrs. Gibbs' policy with State Farm or that he is not, the Court will deny both motions.

## DISCUSSION

## I.     STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.    RELEVANT POLICY TERM

The essential question for both parties' motions for summary judgment is whether Gibbs was a "resident relative" under the relevant policy terms at the time of the accident.  *See Johnson v. Allstate Prop. & Cas. Ins. Co.*, 890 F. Supp. 2d 1100, 1104 (D. Minn. 2012) ("The Court determines residency as of the date of the event triggering the claim for coverage.").

### A.     Legal Standards

"State law governs the interpretation of insurance policies."  *Nat'l Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.*, 346 F.3d 1160, 1164 (8th Cir. 2003).  The parties do not dispute that Minnesota law applies here.  Under Minnesota law, the interpretation of an insurance policy is a question of law for the Court.  *Quade v. Secura Ins.*, 814 N.W.2d 703, 705 (Minn. 2012).  Where policy terms are unambiguous, the Court interprets the terms in accordance with their plain and ordinary meaning.  *Id*.  The parties

do not dispute that the relevant policy terms are unambiguous.  Accordingly, the Court will interpret the terms according to their plain and ordinary meaning. [3]

Under Minnesota law, whether a person's circumstances fall within the plain, ordinary meaning of a policy's terms defining "resident relative" is typically a question of fact. *See Fruchtman v. State Farm Mut. Auto. Ins. Co.*, 142 N.W.2d 299, 300 (Minn. 1966) ("Whether plaintiff's mother was a member of his family, residing in the same household, is essentially a fact question."); *Wood v. Mut. Serv. Cas. Ins. Co.*, 415 N.W.2d 748, 750 (Minn. Ct. App. 1987) (analyzing residency under similar "temporarily liv[ing] elsewhere" term and observing, "[r]esidency in a household is a question of fact . . . . The Minnesota Supreme Court has reviewed a number of cases involving residency and each case turns on its own specific set of facts." (citing *Rosenberger v. Am. Family Mut. Ins.* Co., 309 N.W.2d 305 (Minn. 1981); *Firemen's Ins. Co. of Newark, N.J. v. Viktora*, 318 N.W.2d 704 (Minn. 1982); *Fruchtman*, 142 N.W.2d at 300)).  However, a court may determine whether a person resided with an insured as a matter of law when the facts are undisputed. *See French v. State Farm Mut. Auto. Ins. Co.*, 372 N.W.2d 839, 841 (Minn.

---

[3] Even if the parties did dispute the meaning of the term or argue that it was ambiguous, Minnesota courts have overwhelmingly found that residency terms in insurance policies are unambiguous. *See Lott v. State Farm Fire & Cas. Co.*, 541 N.W.2d 304, 307 (Minn. 1995) ("residents of your household" was unambiguous); *Firemen's Ins. Co. of Newark, N.J. v. Viktora*, 318 N.W.2d 704, 706 (Minn. 1982) (applying Wisconsin Supreme Court precedent finding that the term "resident or member of the same household" as used in automobile liability insurance policies is not ambiguous).  The Minnesota Court of Appeals has also deemed language very similar to this Policy's "temporarily living elsewhere" language to be unambiguous. *Barradas v. State Farm Mut. Auto Ins. Co.*, No. A05-1097, 2006 WL 852102, at *2 (Minn. Ct. App. Apr. 4, 2006) (interpreting policy term "[a] person resides in the same household with you if that person's home is usually in the same family unit, even though temporarily living elsewhere" and deeming the provision unambiguous).

Ct. App. 1985) (concluding court could determine residency as a matter of law where parties had stipulated to the relevant facts).

### B.      Policy Terms

The Policy defines "resident relative" as "a person, other than you who is . . . related to you by blood . . . who resides with you." (State Farm Policy at 5 (emphases omitted).)  The Policy further states that "A person resides in the same household with you if that person's home is usually in the same family unit, even though temporarily living elsewhere." (*Id*. (emphases omitted).)  The parties' dispute centers on this portion of the definition – whether, at the time of the accident, Gibbs' living arrangement in the North Mankato apartment can be fairly characterized as him "temporarily living elsewhere."

Minnesota courts have provided guidance for what it means for persons to reside in the same household.  The Minnesota Supreme Court in *Lott v. State Farm Fire & Casualty Co.* explained that the meaning of the term

> "household" refers to a social unit which is something more than a group of individuals who occasionally spend time together in the same place.  Thus, in order to determine whether an individual is a resident of the insured's household, [courts] must look at the nature of the individual's relationship with the social unit that makes up the insured's household and not simply at the individual's connection to the place where the insured resides.

541 N.W.2d 304, 307 (Minn. 1995).  The court further explained that the "nature of the individual's relationship with the social unit that makes up the insured's household" can be analyzed by looking to three factors, first adopted by the Minnesota Supreme Court in *Viktora*, 318 N.W.2d at 706: "first, whether the individual and the insured are living

- 11 -

under the same roof; second, whether the individual and the insured are living in a close, intimate, and informal relationship; and third, whether the intended duration is likely to be substantial." *Lott*, 541 N.W.2d at 307-08 (citing *Viktora*, 318 N.W.2d at 706).

While the *Viktora* factors provide useful guidance for determining residency generally, they were first adopted and are most frequently applied in cases where the relevant policy term does not include the additional explanatory phrase found in the instant Policy that a person can be a resident "if that person's home is usually in the same family unit, even though temporarily living elsewhere," (State Farm Policy at 5). *See Viktora*, 318 N.W.2d at 706 (adopting factors to interpret term "resident[] of the Named Insured's household"). When the policy does provide additional information about the meaning of resident relative, courts do not rely solely on the *Viktora* factors. *Compare Lott*, 541 N.W.2d at 308 (applying *Viktora* factors to interpret only "residents of your household"), *with Wood*, 415 N.W.2d at 750 (mentioning, but not relying on *Viktora* factors in interpreting residency where relevant terms include: "A person resides in the same household with the named insured if that person usually makes his home in the same family unit, even though he temporarily lives elsewhere.").

Thus, the Court will look to the *Viktora* factors only to the extent that they are useful in considering whether Gibbs lived elsewhere only temporarily. *Cf. French*, 372 N.W.2d at 842-43 (where policy stated "[a] person resides in the same household with the named insured if that person usually makes his home in the same family unit, even though he temporarily lives elsewhere," noting that, "as in most of the cases discussed above, the policy provision at issue [in *Viktora*] was not exactly the same as the one at

issue here" and concluding it was proper for district court to consider *Viktora* factors, where it considered "that case in addition to several others.").

Instead, the Court will look primarily to Minnesota courts analyzing coverage under policies with the same "temporarily living elsewhere" term as here. At a minimum, these cases suggest that the caveat that a person may reside with an insured although "temporarily living elsewhere" means that the person **intends** a stay elsewhere to be temporary and, once over, to resume living with the insured. In *French*, 372 N.W.2d 839, the Minnesota Court of Appeals found it to be "significant that [the insured's son] had been purposely staying away from his parents' home, living with friends or in his car, and was totally self-supporting" in concluding that the son did not reside with his parents at the time of the accident. *Id.* at 843. Citing this analysis from *French*, the Minnesota Court of Appeals in *Wood*, 415 N.W.2d 748, concluded that in determining residency, factors to be considered include: (1) the age of the person; (2) whether the person has established a separate residence; (3) the self-sufficiency of the person; (4) the frequency and the duration of the person's stay in the family home; and (5) the person's intent to return. *Id.* at 750-51 (noting further that "[t]he fact that belongings remain in the home and the home continues to be the mailing address may be considered, but are not dispositive"). The court proceeded to analyze the facts, with particular reliance on the fact that the insured's son's "career plans were uncertain" and that "[b]oth [the insured's son] and his parents testified that they considered the parents' home as [the son's] permanent home and his stay in the Army was temporary." *Id.* at 751. Based on these facts, the court concluded that the son "clearly intended to return

home." *Id.*   Similarly, in *Barradas v. State Farm Mutual Automobile Insurance Co.*, No. A05-1097, 2006 WL 852102 (Minn. Ct. App. Apr. 4, 2006), the Minnesota Court of Appeals noted that all parties involved – the insureds, their daughter, and her fiancé – "believed at the time of the accident that [the daughter and her fiancé's] stay at the Cox home would be short-term" in concluding that the daughter was not a resident of her parents' home and thus not covered under their insurance.  *Id.* at *3.[4]

Thus, the intention of the parties – both the insured and the person whose residency with the insured is in question – with regard to the duration of a certain arrangement is usually central to courts' application of the resident relative term at issue here.  The Court, then, in considering whether it can conclude as a matter of law that Gibbs was a part of Mrs. Gibbs' family unit but temporarily living elsewhere, will look in particular to Gibbs' and Mrs. Gibbs' intentions with regard to duration of his stay at the apartment.

## C.    Applying Policy Term to Facts

The Court concludes that there are genuine disputes of material facts with regard to whether or not Gibbs intended his stay in the apartment to be temporary such that a

---

[4]  Even courts analyzing coverage under policies without the "temporarily living elsewhere" term consider the parties' intent with regard to duration of stay to be highly relevant to the residency analysis.  *See Viktora*, 318 N.W.2d at 706 (third *Viktora* factor looks to whether "the intended duration is likely to be substantial"); *Fruchtman*, 142 N.W.2d at 301 (rejecting insurance company's construction of residency under a policy because it would fail to take into account a party's "ultimate intention to return to some other location").

reasonable jury could find either for Gibbs or for State Farm.  The Court will thus deny both motions for summary judgment.

Taking the facts in a light most favorable to Gibbs, there are facts upon which a jury could conclude that he was part of his mother's family unit and intended his stay in the apartment to be only temporary.  Gibbs and his mother testified that they had discussed the possibility of him moving back in after his temporary job ended, and even after he was able to stay a month longer at the apartment because of the savings bond. (Gibbs Dep. at 30-31, 48-49; Rita Gibbs Dep. at 25.)  Gibbs testified that, in preparation for such a move, he had moved some of his belongings back to the house and that he believed that he gave his mother's address to the temporary staffing agency because he anticipated that he would be moving back to her house.  (Gibbs Dep. at 30-31).  A jury could infer from these facts that, at the time of the accident, Gibbs intended to return to his mother's house after a temporary stay at the apartment.  A jury could furthermore infer that his stay at the apartment was temporary from other facts – his young age, his close relationship with and reliance upon his mother (for laundry and rides to work), and his frequent visits to the house and continued participation in household routines, such as meals and church.

However, taking the facts in a light most favorable to State Farm, a jury could also conclude that Gibbs did not intend his stay in the apartment to be temporary.  He took most of his personal belongings with him to the apartment, he moved a bed to the apartment in November even after his Halloween costume job ended, and did not move home immediately after that job ended, but rather stayed in the apartment when he could

pay rent with the savings bond.  Additionally, a jury could conclude based on Gibbs'
affidavit to Progressive and Mrs. Gibbs' statements to State Farm that neither intended
Gibbs' stay in the apartment to be temporary.  In Gibbs' Progressive affidavit, which is
entitled "Affidavit of No Insurance/Residency," Gibbs' address at the apartment is
handwritten in as where he lived on the date of the accident.  (McBride Aff., Ex. 3.)  The
affidavit also includes a pre-written (typed) statement: "To the best of my knowledge, I
am not otherwise entitled to Minnesota No-Fault benefits from this accident."  (*Id.*)  State
Farm argues that these statements show that Gibbs confirmed, after his accident, that he
was not living with his mother and that he was not covered by her insurance.  Mrs. Gibbs
testified that, in the process of applying for the Policy, she told State Farm that she was
the only person living in her household when she applied in November, 2011. (Rita Gibbs
Dep. at 17.)   State Farm argues that this clearly demonstrates that Gibbs was not a
resident relative because, under the *Viktora* factors, courts should consider how parties
considered their relationship "in contracting about such matters as insurance or in their
conduct in reliance thereon."   *Viktora*, 318 N.W.2d at 706 (internal quotation marks
omitted).  Certainly, a jury could conclude based on these statements that neither Gibbs
nor his mother intended his stay in the apartment to be temporary.

   But these statements do not **require** a jury to conclude that Gibbs was not residing
with Mrs. Gibbs at the time of the accident.  Rather, a jury could weigh Gibbs' and his
mother's testimony about the prospect of him moving home against those statements and
conclude that those statements do not negate either of their testimonies regarding intent.
First, with regard to the Progressive affidavit, Gibbs testified in his deposition that he was

taking opioid-based painkillers at the time, which may have affected his ability to accurately fill out the form (he later testified that he did not know why he listed his North Mankato address on the form (*see* Gibbs Dep. at 63)).  *Cf. United States v. Heller*, 551 F.3d 1108, 1113 (9th Cir. 2009) (recent ingestion of painkillers a factor in determining whether confessions in criminal cases are voluntary and not made with impaired reasoning or judgment).  In light of Gibbs' testimony attacking the credibility of the affidavit as accurately representing his intention and understanding with regard to his residence, the significance and weight of this evidence as bearing on Gibbs' understanding and intentions with regard to his living situation are questions for the jury.

Second, neither the affidavit nor Mrs. Gibbs' statements necessarily bear on Gibbs and his mother's intent with regard to his stay in the apartment at the time of the accident. A jury could conclude that Gibbs' own subjective understanding of whether he was insured under his mother's policy is not determinative with regard to the question of whether he was covered as a resident relative under the Policy.  Similarly, it would be reasonable for a jury to conclude that, in stating that no one resided with her at the time, Mrs. Gibbs intended a colloquial meaning of the term "reside" rather than the technical definition from the Policy – nothing in the record suggests that Mrs. Gibbs stated to State Farm that she had no "resident relatives" as defined by the policy, rather simply that no one lived with her at the time.

Finally, with regard to Mrs. Gibbs' statement, the time of Mrs. Gibbs' application to State Farm (November 2011) is not the same as the relevant time for the purposes of this inquiry – the time of the accident (December 2011) – and a reasonable jury could

conclude that, by the time of the accident in December, her understanding of Gibbs' plans and circumstances had changed, based on the fact that he had begun to move some things back to her house and still depended on his mother for laundry, rides, and some meals. Thus, a jury could choose to credit Gibbs' and Mrs. Gibbs' testimony regarding their intent over any inferences that could be drawn from these statements in State Farm's favor.

Other courts' conclusions as to residency for insurance purposes do not alter this analysis. State Farm points to cases in which, it claims, the facts are comparable and the court ruled as a matter of law that the person seeking coverage did not reside with the insured, but many of those cases involved undisputed facts showing no intent to reside with the insured. In *Allstate Property and Casualty Insurance Co. v. Myllykangas*, 504 F. Supp. 2d 596 (D. Minn. 2007), the mother and daughter testified unequivocally that the daughter's living situation away from home "was permanent and that [the daughter] had no intent to return to that household." *Id.* at 602. Similarly, in *Barradas*, the court had plenty of evidence clarifying that the daughter and fiancé never intended to live with her parents (especially because the fiancé did not get along with the in-laws), such that their eight-day stay there did not render them part of the household. 2006 WL 852102 at *3. State Farm also points to *Van Overbeke v. State Farm Mutual Automobile Insurance Co.* as supporting its position. 227 N.W.2d 807, 809 (Minn. 1975). There, a younger brother, who lived at home with his parents, loaned his car to his older brother, who lived separately with a roommate. *Id.* The older brother got in an accident and the court held that he was not a resident of his parents' household such that he was covered by the

policy covering his brother's car. *Id.* at 809-10. The Minnesota Supreme Court relied on the fact that he did not intend to return to his parents' household but rather intended to live indefinitely in a separate town. *Id.* Notably, the standard of review in that case differs from this one – there the court reviewed a trial court's denial of a motion for new trial, *see id.* at 812, rather than a pre-trial ruling on a motion for summary judgment, where the Court must take the facts in a light most favorable to the non-moving party. In contrast to this case, here Gibbs asserts that he intended to return to the house in St. Peter and there are facts upon which a reasonable jury could, but would not be required to, find that assertion to be credible.

Gibbs argues that his circumstances compare to others in which courts have ruled as a matter of law for the person seeking coverage as a resident relative. He points to *Skarsten v. Dairyland Insurance Co.*, where the Minnesota Court of Appeals considered whether a 24-year-old college student could be considered to reside with her father. 381 N.W.2d 16 (Minn. Ct. App. 1986). There, the daughter had moved several times since graduating from high school (including a move to California to establish residency, although she returned after nine months), lived in an apartment in Minneapolis, returned to her parent's farm one or two weekends a month and for holidays, and considered her parents' farm to be her permanent address. *Id.* at 17-18. The court found that, although the daughter and father were not physically living together under the same roof at the time of the accident, her "absence from the family farm was of a temporary nature; she intended to return, if only for weekends and holidays, and considered the farm her permanent residence." *Id.* at 19. Thus, the court concluded that she "usually makes her

home in the same family unit, even though she temporarily lives elsewhere" and found that the trial court erred as a matter of law in finding that she was not an insured under her father's policy. *Id*. at 19-20. *Skarsten* does not compel the Court to conclude here that Gibbs resided in Mrs. Gibbs' household as a matter of law, because, unlike here, *Skarsten* did not have statements by the parties, such as Gibbs' affidavit to Progressive or Mrs. Gibbs' statements to State Farm, that a jury could conclude undermine the parties' testimony that any stay elsewhere was intended to be temporary.

Thus, the Court finds that a reasonable jury could conclude either that Gibbs was a resident relative of Mrs. Gibbs or that he was not, and will deny both parties' motions for summary judgment.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      State Farm Mutual Automobile Insurance Co.'s Motion for Summary Judgment [Docket No. 13] is **DENIED**.

2.      Bradley Gibbs' Motion for Summary Judgment [Docket No. 22] is **DENIED**.

DATED:  March 20, 2014                               s/ John R. Tunheim
at Minneapolis, Minnesota.                                JOHN R. TUNHEIM
                                                      United States District Judge